UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| INDIANA COALITION FOR PUBLIC EDUCATION - MONROE COUNTY AND SOUTH CENTRAL INDIANA, INC., | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) | No. 1:17-cv-01295-JMS-MPB |
| | ) | |
| JENNIFER MCCORMICK, JAMES BETLEY, | ) ) ) | |
| Defendant. | ) ) | |
| _____ | ) | |
| SEVEN OAKS CLASSICAL SCHOOL, INC., | ) ) | |
| Intervenor Defendant. | ) | |

**<u>ENTRY</u>**

Plaintiff Indiana Coalition for Public Education ("<u>Coalition</u>") alleges that the Indiana Charter School Act ("<u>Charter School Act</u>" or "<u>Act</u>"), Ind. Code § 20-24-1-1, *et seq*, delegates the power to authorize public charter schools to religious institutions. [Filing No. 1.] According to the Coalition, this delegation and the funding that accompanies it violate both the Establishment Clause of the First Amendment to the U.S. Constitution and the Indiana Constitution. [Filing No. 1.] Nonparty Grace College is one such private religious institution that may authorize charter schools under the Act. Grace College has authorized several charter schools, including Intervenor Defendant Seven Oaks Classical School, Inc. ("<u>Seven Oaks</u>"). Pending before the Court is Seven Oaks' Motion to Dismiss, [Filing No. 57], which seeks to dismiss the Coalition's Complaint for lack of jurisdiction and for failure to state a claim. The Court concludes that it cannot fully address

all of Seven Oaks' arguments in the absence of a factual record. The Court therefore **GRANTS IN PART** and **DENIES IN PART** Seven Oaks' Motion.

## I.
### STANDARDS OF REVIEW

Seven Oaks first seeks to dismiss the Coalition's Complaint for lack of standing. Standing is a jurisdictional requirement, *Cabral v. City of Evansville*, 759 F.3d 639, 641 (7th Cir. 2014), and must therefore be evaluated under Rule 12(b)(1). Rule 12(b)(1) "allows a party to move to dismiss a claim for lack of subject matter jurisdiction." *Hallinan v. Fraternal Order of Police of Chicago Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). The burden is on the plaintiff to demonstrate that subject matter jurisdiction exists for its claims. *See Lee v. City of Chicago*, 330 F.3d 456, 468 (7th Cir. 2003).

Seven Oaks also contends that the Coalition's Complaint fails under Rule 12(b)(6), which allows a party to move to dismiss a claim that does not state a right to relief. The Federal Rules of Civil Procedure require that a complaint provide the defendant with "fair notice of what the . . . claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (quoting *Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2007)). In reviewing the sufficiency of a complaint, the Court must accept all well-pled facts as true and draw all permissible inferences in favor of the plaintiff. *See Active Disposal Inc. v. City of Darien*, 635 F.3d 883, 886 (7th Cir. 2011). A Rule 12(b)(6) motion to dismiss asks whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). The Court will not accept legal conclusions or conclusory allegations as sufficient to state a claim for relief. *See McCauley v. City of Chicago*, 671 F.3d 611, 617 (7th Cir. 2011). Factual allegations must plausibly state an entitlement to relief "to a degree that rises above the speculative level." *Munson v. Gaetz*, 673

F.3d 630, 633 (7th Cir. 2012). This plausibility determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

## II.
### BACKGROUND

The following facts are drawn from the Coalition's Complaint, [Filing No. 1], and the Charter School Act. The factual allegations in the Complaint are accepted as true for the purpose of resolving Seven Oaks' Motion.

### A. The Parties and One Nonparty

The Coalition is a nonprofit association located in Monroe County, Indiana, consisting of public school teachers, public school employees, parents with children in public schools, and taxpayers. [Filing No. 1 at 3.] The Coalition advocates for the funding of public school corporations and against the diversion of funds to private and charter schools. [Filing No. 1 at 3.]

The Defendants include Seven Oaks, a charter school in Monroe County, and, in their respective official capacities as superintendent of public instruction and as executive director of the Indiana Charter School Board, Jennifer McCormick and James Betley ("State Defendants"). [Filing No. 1 at 3-4.] Seven Oaks is the only Defendant to file a motion to dismiss under Rule 12(b)(6).

Conspicuously (and perplexingly) absent from this list of defendants is Grace College, whose ability to authorize charter schools (including Seven Oaks) is at the heart of the Coalition's constitutional challenge. [*See* Filing No. 1.] Grace College is an evangelical Christian college and seminary which, according to the Coalition, "applies biblical values to its educational mission, emphasizes a biblical worldview, and teaches students to recognize scripture as the inerrant and inspired Word of God." [Filing No. 1 at 7-8.]

**B. Charter Authorization System**

With the stated goals of providing "innovative and autonomous programs" to serve "different learning styles" and offer "choices" and "flexibility," Ind. Code § 20-24-2-1, the Charter School Act created a group of "authorizers" to consider applications from prospective organizers wishing to operate "nonsectarian and nonreligious" public charter schools,[1] Ind. Code § 20-24-1-4; *e.g.*, Ind. Code §§ 20-24-1-2.5, 20-24-1-3, 20-24-3-1. The Act names as authorizers the mayor of Indianapolis, the Charter School Board, and state and nonprofit colleges, among others. Ind. Code § 20-24-1-2.5. Prior to July 1, 2015, this meant that any college could authorize a charter school, Ind. Code § 20-24-1-2.5(5) (2013) (amended 2015); a subsequent amendment requires colleges to seek approval from the state board prior to becoming authorizers, though the amendment grandparented any college that had issued a charter prior to July 1, 2015, Ind. Code §§ 20-24-1-2.5(5), 20-24-2.2-1.2. Authorizers "shall adopt standards of quality charter school authorizing, as defined by a nationally recognized organization with expertise in charter school authorizing." Ind. Code § 20-24-2.2-1.5.

A prospective organizer initiates the application process by submitting a proposal to an authorizer. Ind. Code § 20-24-3-4(a). The proposal must provide a variety of information ranging from governance structure, Ind. Code § 20-24-3-4(b)(3)(C), to instructional methods, Ind. Code § 20-24-3-4(b)(3)(F), to admission criteria, Ind. Code § 20-24-3-4(b)(3)(H), to financial plans, Ind. Code § 20-24-3-4(b)(3)(M). The authorizer is then responsible for reviewing the application pursuant to its "procedures, practices, and criteria," which must be "consistent with nationally

---

[1] As discussed below, the Coalition wholly fails to acknowledge this provision requiring that charter schools be "nonsectarian and nonreligious," even omitting the provision from its "Appendix of Relevant Provisions." [*See* Filing No. 61 at 22-25.] Section 20-24-1-4 is undoubtedly relevant to this case.

recognized principles and standards for quality charter authorizing." Ind. Code § 20-24-3-4.5. Prior to issuing a charter, the authorizer must conduct a public hearing in the school corporation where the proposed charter school would be located. Ind. Code § 20-24-3-5.5. Authorizers must annually report to the Indiana Department of Education information on all charter proposals, including the reasons for any rejections and the length of any approvals. Ind. Code § 20-24-3-10.

A charter may only be granted for a period of three to seven years, Ind. Code § 20-24-4-1(a)(5)(A), after which the organizer and authorizer may agree to a renewal, Ind. Code § 20-24-4-1(a)(6)(B). The Act provides that a charter school must "not remain in the lowest category or designation of school improvement . . . in the third year after initial placement in the lowest category or designation" as determined by the State Board of Education pursuant to statute. Ind. Code § 20-24-2.2-2(a). An authorizer wishing to renew a charter school that does not comply with these minimum standards must petition and appear before the state board. Ind. Code § 20-24-2.2-2(b)–(c). The state board may take any appropriate action, including ordering the closure of the underperforming school. Ind. Code § 20-24-2.2-2(d).

The authorizer must conduct a performance review of a charter school at least once every five years, as specified in the charter. Ind. Code § 20-24-4-1(a)(6)(A). The charter must also specify its own standards for renewal, grounds for revocation of a charter prior to its expiration, and accountability and assessment methodology, among other details. Ind. Code § 20-24-4-1(a). Additionally, the charter school and authorizer must set annual performance goals "designed to help each school meet applicable federal, state, and authorizer expectations." Ind. Code § 20-24-4-1(b).

If an organizer's charter school proposal is rejected by an authorizer, the organizer may amend its proposal and submit the amended proposal to the same authorizer or may submit a

proposal to another authorizer.[2]  Ind. Code § 20-24-3-11.  There are no limitations on the number of times an organizer may submit a charter school proposal.  *See id.*

### C.  Funding

Charter schools receive public funds in the same manner as all other Indiana public school corporations.  Ind. Code § 20-24-7-15.  An authorizer "may collect from the organizer of a charter school . . . an administrative fee equal to not more than three percent (3%) of the total amount the organizer receives . . . for basic tuition support."  Ind. Code § 20-24-7-4(c).  The authorizer, in an annual report made publicly available on the internet, Ind. Code § 20-24-9-1, must "summariz[e] the total amount of administrative fees collected by the authorizer and how the fees were expended," Ind. Code § 20-24-9-2(9).

### D.  Seven Oaks' Approval

Seven Oaks is an Indiana charter school formed under the Charter School Act.  [Filing No. 1 at 6.]  Seven Oaks' approved application with Grace College was its third attempt at obtaining a charter.  First, in 2014, Seven Oaks applied to the Indiana Charter School Board for authorization, which was denied.  [Filing No. 1 at 5.]  In spring 2015, Seven Oaks again applied to the Indiana Charter School Board, but withdrew the application the day before the Board was scheduled to vote because the organizers were informed that the application would again be denied.  [Filing No. 1 at 5.]

---

[2] On occasion, Seven Oaks appears to reference previous versions of provisions in the Act which were in effect at the time of briefing, though the new versions had already been passed by that time.  [*E.g.*, Filing No. 58 at 16 (referencing the 2013 version of Indiana Code section 20-24-3-11, which permitted rejected organizers to appeal to a charter school review panel).]  In the end, these differences do not affect the outcome, though the failure to advise the Court of such pending changes made the Court's review of the relevant provisions more time consuming.

Finally, in fall 2015, Seven Oaks submitted its application (substantively unchanged from its spring application) to Grace College. [Filing No. 1 at 5.] That application was approved at a closed meeting of the Grace College governing board in 2016. [Filing No. 1 at 5.] Grace College's governing board also makes decisions regarding the college's operation and religious mission and did not create any separate entity to facilitate the charter school authorization process. [Filing No. 1 at 6.] Grace College has not made any information publicly available regarding its procedures and criteria for authorizing Seven Oaks, nor has it explained whether it complies with nationally recognized standards for quality charter authorizing. [Filing No. 1 at 5.]

Seven Oaks opened in 2016 and enrolled 166 students in the 2016-17 school year. [Filing No. 1 at 6.] Seven Oaks expects to enroll between 400 and 700 students in future years. [Filing No. 1 at 6.] Most enrolled students reside in Monroe County and would otherwise enroll in one of two Monroe County public school corporations. [Filing No. 1 at 6.] Under Indiana law, the funding follows the student, meaning that a public school's state funding is based upon the number of students attending. Ind. Code §§ 20-43-1-8, 20-43-6-3.[3] The public school corporations stand to lose approximately $6,500 per student for those who attend Seven Oaks instead of the public school corporation schools. [Filing No. 1 at 6.] The loss of funds has caused or will cause a reduction in the public corporation schools' budgets, leading to staff and teacher layoffs, increased class sizes, and programming cuts. [Filing No. 1 at 6.]

### E. Procedural History

On April 25, 2017, the Coalition brought suit, alleging that the Charter School Act violates the First Amendment to the U.S. Constitution and the Indiana Constitution, Article I, section 6 by

---

[3] It is out of this funding that an authorizer may collect its three percent administrative fee. *See* Ind. Code § 20-24-7-4(d).

allowing religious institutions to authorize charter schools and by providing public funding to the religious institutions to cover administrative fees. [Filing No. 1.] These claims are divided into three counts: Count I alleges that permitting religious schools, such as Grace College, to serve as authorizers violates the Establishment Clause. [Filing No. 1 at 7-9.] Count II alleges that the provision of public funds to religious institutions violates the Establishment Clause. [Filing No. 1 at 9-10.] Count III alleges that the provision of public funds to religious institutions violates the Indiana Constitution. [Filing No. 1 at 10.]

On June 19, 2017, Seven Oaks filed a motion to dismiss for failure to state a claim, [Filing No. 32], and a motion to join Grace College as a defendant, [Filing No. 33]. On June 28, 2017, the Coalition noticed the voluntary dismissal of Seven Oaks, [Filing No. 35], after which the Court denied Seven Oaks' pending motions to dismiss and for joinder as moot, [Filing No. 39; Filing No. 40.] On July 12, 2017, Seven Oaks moved to intervene, [Filing No. 41], which the Court granted on August 2, 2017, [Filing No. 56].

On August 10, 2017, Seven Oaks filed its Motion to Dismiss, [Filing No. 57], which is now ripe for the Court's determination.

### III.
#### DISCUSSION

Seven Oaks leads with its arguments that the Coalition's claims fail on their merits, but it also briefly argues at the end of its brief that the Coalition lacks standing to pursue its claims. Because standing is a jurisdictional requirement, the Court must address it first before turning to Seven Oaks' Rule 12(b)(6) arguments. *See Booker-El v. Superintendent, Ind. State Prison*, 668 F.3d 896, 899-900 (7th Cir. 2012) (noting that courts may not "decide the merits of the case before satisfying [themselves] of standing").

Next, Seven Oaks argues that each of the Coalition's claims must be dismissed for failure to state a claim. The State Defendants did not join in Seven Oaks' Motion. Instead, the State Defendants notified the Court that they "support[] the arguments in defense of the statute advanced by Seven Oaks . . . , but take[] no position as to whether a Rule 12(b)(6) motion is the appropriate procedural vehicle for resolving [the Coalition's] constitutional claims." [Filing No. 63 at 2.]

## A. Standing

Seven Oaks argues that the Coalition lacks standing to challenge the validity of Seven Oaks' charter and the provision of public money to Seven Oaks. [Filing No. 58 at 23-24.] Seven Oaks argues that the Coalition only asserts taxpayer standing and that the only available relief in a taxpayer suit is an injunction against the specific appropriation that violates the Establishment Clause. [Filing No. 58 at 23-24.]

In response, the Coalition argues that it pleaded specific injury and thus does not rely upon taxpayer standing. [Filing No. 61 at 20.] The Coalition argues that the relief sought would redress the injuries its members have suffered. [Filing No. 61 at 20.]

In reply, Seven Oaks argues that the Coalition must have standing for each form of relief sought and that it does not have taxpayer standing to seek relief against Seven Oaks. [Filing No. 62 at 17.]

Under Article III of the U.S. Constitution, "whether the plaintiff has made out a 'case or controversy' between [itself] and the defendant" is a "threshold question in every federal case." *Warth v. Seldin*, 422 U.S. 490, 498 (1975); *see* U.S. Const. Art. III § 2, cl. 1. Standing is the aspect of the case or controversy requirement that looks to whether a plaintiff has a "vested interest in the case." *Cabral v. City of Evansville*, 759 F.3d 639, 641 (7th Cir. 2014). The standing inquiry requires a plaintiff to establish three elements: (1) an "injury in fact" suffered by the plaintiff, (2)

a causal connection between the injury and improper conduct, and (3) that the injury would likely be redressed by a favorable result. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). "[A] plaintiff must demonstrate standing for each claim [it] seeks to press and for each form of relief that is sought," *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) (internal quotation omitted), though "each element of standing must be supported in the same way as any other matter on which the plaintiff bears the burden of proof," *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015) (internal quotation and bracket omitted). This means that, on a motion to dismiss, a plaintiff must only "alleg[e] a basis of subject matter jurisdiction." *Id.* at 173. Where, as here, the plaintiff is an association, "[t]he association must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit." *Warth v. Seldin*, 422 U.S. 490, 511 (1975).

Seven Oaks is correct that the Supreme Court has placed tight constraints on the circumstances in which a person may assert standing based upon an injury suffered from paying taxes to finance an allegedly unconstitutional enterprise. *E.g.*, *Frothingham v. Mellon*, 262 U.S. 447, 486-89 (1923) (recognizing general bar on taxpayer suits); *Flast v. Cohen*, 392 U.S. 83 (1968) (articulating exception to bar on taxpayer suit where Congress taxes or spends monies in violation of the Establishment Clause); *Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587 (2007) (plurality decision) (limiting *Flast* to the situation presented in that case). But Seven Oaks is incorrect that Seven Oaks merely alleges a taxpayer's injury; the tight restrictions on such suits therefore do not apply. To the contrary, though Seven Oaks failed to even acknowledge this argument in its reply, the Coalition argues that its members have suffered "specific injury" as a result of the funding lost to Seven Oaks, made possible only because of the allegedly

unconstitutional delegation of governmental activity (charter authorization) to Grace College. [Filing No. 61 at 20.]  According to the Coalition, the loss of funding will require faculty layoffs and programming cuts, which would directly harm the teachers and school parents who are members of the Coalition.  [Filing No. 1 at 3.]

These facts take the Coalition's claims out of  the realm of cases such as *Frothingham*, which was concerned with general grievances, "shared with millions of others," and speculative remedies, "so remote, fluctuating and uncertain." 262 U.S. at 487.  Rather, the teachers and school parents share their grievances only with fellow teachers, schoolchildren, and school parents who likewise object to the delegation of charter authorizing to religious institutions, so the injuries are particularized.  And, at least based on the pleadings, it is plausible that voiding Seven Oaks' charter or cutting off its state funding would cause the former charter school students to attend the public school corporations' schools, thus restoring the lost funding to the school corporations. Accordingly, redressability is not speculative.  *Cf., e.g.*, *Booker-El v. Superintendent, Ind. State Prison*, 668 F.3d 896, 899-900 (7th Cir. 2012) (finding that prisoner had standing to challenge alleged misappropriation of prison recreation fund monies because the plaintiff "face[d] a substantial risk in losing benefits to which he was entitled").  The Court concludes that the Coalition has plausibly alleged that it has standing to pursue its claims against Seven Oaks, which is all that is required at the motion to dismiss stage.

### B.  Establishment Clause Claims

Counts I and II challenge the Charter School Act under the Establishment Clause of the First Amendment to the U.S. Constitution.  That Clause provides that "Congress shall make no law respecting an establishment of religion."  U.S. Const., Amend. I, cl. 1.  The Clause is

incorporated against the states by the Fourteenth Amendment. *Everson v. Bd. of Educ. of Twp. of Ewing*, 330 U.S. 1 (1947).

Both parties recognize that the Coalition's Establishment Clause claims must be evaluated under the framework outlined in *Lemon v. Kurtzman*, 403 U.S. 602 (1971), which recognized that the "language" of the Clause "is at best opaque":

> Its authors did not simply prohibit the establishment of a state church or a state religion, an area history shows they regarded as very important and fraught with great dangers. Instead they commanded that there should be 'no law respecting an establishment of religion.' A law may be one 'respecting' the forbidden objective while falling short of its total realization. A law 'respecting' the proscribed result, that is, the establishment of religion, is not always easily identifiable as one violative of the Clause. A given law might not establish a state religion but nevertheless be one 'respecting' that end in the sense of being a step that could lead to such establishment and hence offend the First Amendment.

*Id.* at 612. In an effort to "draw lines" as to what state action constitutes a "law respecting an establishment of religion," the *Lemon* Court articulated a time-honored, three-part test: "First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally, the statute must not foster an excessive government entanglement with religion." *Id.* at 612-13 (internal citations omitted).

The Supreme Court has addressed and applied this test in each of the contexts raised by the Coalition's Establishment Clause claims, to which the Court now turns.

### 1. Delegation of Authorizing Authority (Count I)

Seven Oaks argues that permitting religious institutions to authorize charter schools does not violate the Establishment Clause. Seven Oaks points out that the Charter School Act requires authorizers to follow nationally-recognized authorizing standards and to report on all charter proposals to the Indiana Department of Education. [Filing No. 58 at 16.] Seven Oaks also points to the ability of organizers to seek alternative authorizers and the objective performance criteria

set for charter school performance by the Act. [Filing No. 58 at 16-17.] Finally, Seven Oaks argues that authorizing is a "secular activity," as all charter schools must be nonsectarian and nonreligious. [Filing No. 58 at 17-18.] Seven Oaks argues that these constraints cabin authorizers' discretion in a manner consistent with the Establishment Clause. [Filing No. 58 at 14-19.] Seven Oaks also argues that adopting the Coalition's position would violate the Establishment Clause by requiring the state to exclude religious institutions from participating as authorizers "solely because of the religious character." [Filing No. 58 at 19.] Seven Oaks primarily relies on *Bowen v. Kendrick*, 487 U.S. 589 (1988), and *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012 (2017), in support of its arguments.

In response, the Coalition argues that allowing religious institutions to act as authorizers advances religion and fosters excessive entanglement. [Filing No. 61 at 4-8.] The Coalition argues that the Charter School Act vests significant discretion in authorizers and relies upon *Larkin v. Grendel's Den, Inc.*, 459 U.S. 116 (1982), and *Board of Education of Kiryas Joel Village School District v. Grumet*, 512 U.S. 687 (1994). [Filing No. 61 at 4-8.] The Coalition does not contest that the Act has a secular purpose.

In reply, Seven Oaks argues that the Coalition reads *Larkin* and *Kiryas Joel* much more broadly than intended by the Supreme Court, as evinced in part by the Seventh Circuit's decisions. [Filing No. 62 at 3-8.] The Coalition reiterates its argument that the Charter School Act sufficiently limits the discretion of any religious authorizers such that their authority does not run afoul of the Establishment Clause. [Filing No. 62 at 3-8.]

*Larkin* remains the Supreme Court's most thorough articulation of the rule against "delegation of state power to a religious body." *Hernandez v. Comm'r of Internal Revenue*, 490 U.S. 680, 697 (1989) (citing *Larkin*, 459 U.S. 116). *Larkin* invalidated a state statute that

empowered churches and schools (public and private) to deny liquor licenses for applicants located within 500 feet of the church or school. 459 U.S. at 117.

The *Larkin* Court's decision rested on the second and third elements of the *Lemon* test: First, the Court held that the statute advanced religion because it failed to provide any standards to limit the churches' discretion. *Id.* at 125-26. It troubled the Court that, as interpreted by the Massachusetts Supreme Judicial Court, the statute vested final licensing authority in the churches, as a "veto power over governmental licensing authority." *Id.* at 125. The Court further concluded that "the mere appearance of a joint exercise of legislative authority by Church and State provides a significant symbolic benefit to religion in the minds of some by reason of the power conferred." *Id.* at 125-26.

Second, the *Larkin* Court held that the statute resulted in significant entanglement of state and religion. *Id.* at 126-127. The statute "enmeshe[d] churches in the exercise of substantial governmental powers," *id.* at 126, resulting in a "fusion of governmental and religious functions," *id.* (quoting *Sch. Dist. of Abington Twp. v. Schempp*, 374 U.S. 203, 222 (1963)). As the Court concluded, "The Framers did not set up a system of government in which important, discretionary governmental powers would be delegated to or shared with religious institutions." *Id.* at 127; *see Degrugilliers v. Consolidated City of Indianapolis*, 506 F.3d 612, 617 (7th Cir. 2007) ("The [*Larkin*] Court refused to allow a church a share in secular government.").

Delegation cases, such as *Larkin*, are distinct from public funding or public benefit cases such as *Bowen* and *Trinity Lutheran*, the cases primarily relied upon by Seven Oaks, because a delegation challenge focuses on the nature of the delegated decision-making authority, not merely the expenditure of public funds. *Bowen* involved a challenge to the Adolescent Family Life Act, which was "essentially a scheme for providing grants to public or nonprofit private organizations

or agencies for services and research in the area of premarital adolescent sexual relations and pregnancy." 487 U.S. at 593 (internal quotation omitted). *Bowen* thus concerned the expenditure of funds, not the delegation of authority, a point underscored by the fact that the Court did not cite to *Larkin*, even though that case had been decided only six years earlier. Similarly, *Trinity Lutheran* addressed the interplay between the Free Exercise Clause and the Establishment Clause in deciding that Missouri could not exclude church-run preschools from its rubber playground grant program. 137 S. Ct. 2012. Again, the issue was not whether Missouri could delegate decision-making authority to the church, but whether the plaintiff could be excluded, on the basis of religion, from an "otherwise generally available public benefit program." *Id.* at 2024.

Seven Oaks' reliance on public funding cases is unpersuasive. Here, the Coalition alleges that authorizers are not merely receiving or using grant money, but instead are exercising the governmental function of deciding who may operate public charter schools. This issue falls squarely under the rule in *Larkin*, which means that the Court must evaluate the nature of the delegation and determine whether the Charter School Act provides an "effective means of guaranteeing that the delegated power will be used exclusively for secular, neutral, and nonideological purposes." 459 U.S. at 125 (internal quotation omitted); *cf., e.g.*, *Harkness v. Sec'y of Navy*, 858 F.3d 437, 450 (6th Cir. 2017) (undertaking same inquiry).

As to the specific constraints imposed by the Charter School Act on authorizers' discretion, both parties grossly overstate the strength of their positions. The Court cannot determine based solely upon the pleadings that the delegation of authorizing authority to religious institutions comports with the Establishment Clause as articulated in *Larkin*. A sampling of the parties' overstatements highlights why this issue is inappropriate for resolution under Rule 12(b)(6):

**Statutory Standards.**  The Coalition emphasizes that the Act "is silent on the role that religious criteria can play at the time the authorization decision is made," [Filing No. 61 at 7], while Seven Oaks stresses that charter schools must be "nonsectarian and nonreligious" and that authorizers must follow "nationally recognized" authorizing standards, [Filing No. 62 at 62]. While the Coalition's argument is technically correct (only insofar as there is no specific statute stating that authorization must be religiously neutral), the Coalition remarkably ignores section 20-24-1-4, defining charter schools as "nonsectarian and nonreligious" institutions.  Ignoring unhelpful provisions is not an acceptable litigation strategy.  *Cf., e.g.*, *Borowski v. DePuy, Inc.*, 850 F.3d 297, 304 (7th Cir. 1988) (condemning such "ostrich-like tactic[s]" (internal quotation omitted)).

On the other hand, the provisions Seven Oaks points to are not dispositive of this issue. *Lemon* itself invalidated a funding program that sought only to compensate religious schools for providing "secular educational services."  403 U.S. at 609.  *Lemon* and its progeny require the Court to look beyond such labels to determine whether the statutory scheme as a whole complies with the Establishment Clause.  The other "standards" identified by Seven Oaks provide almost no helpful information to the Court, as there is no record as to what "nationally recognized" authorizing standards actually are, how much discretion they vest in an individual authorizer, what sort of active oversight they contemplate, how the standards are enforced, and so on.  These issues are not resolvable on the pleadings.

**Final Authority.**  The Coalition argues that authorizers have "ultimate authority to reverse the decision of state education officials," citing the fact that Grace College authorized Seven Oaks even though Seven Oaks had twice been denied by Indiana Charter School Board.  [Filing No. 61 at 9.]  Seven Oaks replies that the Coalition is merely playing fast and loose with the statutory

language, which expressly permits rejected organizers to apply to other authorizers. [Filing No. 62 at 6-7.] Seven Oaks further argues that the Charter School Act is "sharply distinguish[ed]" from *Larkin* based upon the requirement that authorizers report on all applications, the ability of rejected organizers to seek alternative authorizers,[4] and the statutory performance criteria imposed for charters. [Filing No. 58 at 16-17.]

Despite Seven Oaks' arguments demonstrating that rejected organizers have a remedy, the allegations in the Complaint support a reasonable inference that the Charter School Act permits a religious authorizer to accept any application it chooses. State officials may override an authorizer's decision and close a charter school only where an already-authorized charter school fails, after three years, to meet the Act's minimum standards. An inference can be drawn that religious authorizers have the last say, even where a duly instituted public board previously finds an application insufficient. Perhaps, as Seven Oaks suggests, the "nationally recognized" authorizing standards cabin this discretion, but, again, on this record Seven Oaks is not entitled to judgment as a matter of law.

Authorizers make important decisions about who may establish charter schools and under what circumstances a charter school may be established, which includes details such as the educational methodology the school will employ. Additionally, charter schools are publicly funded and, insofar as they draw students from public school corporations, their funding may result in a shift of public funds away from other schools. These decisions, when made by a religious institution, may raise Establishment Clause concerns, as recognized by decisions such as *Larkin*. However, *Larkin* also left room for constraints on a religious institution's discretion to ensure that

---

[4] Seven Oaks points to the ability of rejected organizers to appeal pursuant to Indiana Code section 20-24-3-11, but as addressed above, that portion of the statute has been amended.

any delegated power will be used for secular purposes. The Court may not draw adverse conclusions on these issues with the case in the current procedural posture, and therefore **DENIES** Seven Oaks' Motion to Dismiss Count I of the Coalition's Complaint.

### 2. Collection of Administrative Fee (Count II)

Seven Oaks next argues that the religious authorizers' collection of up to three percent of the state funding as an administrative fee comports with the Establishment Clause. [Filing No. 58 at 7-14.] Specifically, Seven Oaks argues that this fee is carefully cabined to cover purely administrative expenses and does not require extensive oversight. [Filing No. 58 at 9-12.]

In response, the Coalition argues that the administrative fee constitutes the "[d]irect funding of religious bodies" and "pervasively sectarian organizations," such that it runs afoul of the Establishment Clause. [Filing No. 61 at 12.] The Coalition argues that even though the purpose of the money paid to religious authorizers may be secular, the money paid "will inevitably be used to pay employees who have dual religious and secular duties," particularly for authorizers such as Grace College where the employees must also work, independent of their authorizing duties, to "advance[e] Grace's evangelical mission." [Filing No. 61 at 13-14.] The Coalition further argues that to the extent the Act provides for oversight of administrative fee collection, that oversight increases the entanglement of state and religion. [Filing No. 61 at 14-15.]

In reply, Seven Oaks argues that the Establishment Clause does not impose a categorical prohibition on direct payments to religious institutions. [Filing No. 62 at 9-10.] Seven Oaks argues that because the payments are merely reimbursement for tasks required under the Charter School Act, the funds could not possibly be used for religious purposes. [Filing No. 62 at 11-12.] Seven Oaks argues that, under these circumstances, the Coalition fails to state a claim as to the administrative fee collection.

In the public funding context, the Establishment Clause "prevents a State from enacting laws that have the 'purpose' or 'effect' of advancing or inhibiting religion." *Zelman v. Simmons-Harris*, 536 U.S. 639, 648-49 (2002) (quoting *Agostini v. Felton*, 521 U.S. 203, 222-23 (1997)); *Freedom from Religion Found., Inc. v. Bugher*, 249 F.3d 606, 610-11 (7th Cir. 2001). As above, the Coalition does not contend that the Charter School Act has a religious purpose. As for the effect, while the Supreme Court's "decisions have drawn a consistent distinction between government programs that provide aid directly to religious schools and programs of true private choice," *Zelman*, 536 U.S. at 649, the case law does not "require [the Court] to invalidate these reimbursements simply because they involve payments in cash," *Cmte. for Pub. Educ. & Religious Liberty v. Regan*, 444 U.S. 646, 658 (1980). Rather, even a cash reimbursement does not directly advance religion where the reimbursement "serve[s] the State's legitimate secular ends without any appreciable risk of being used to transmit or teach religious views." *Id.* at 662. At bottom, to determine whether "government aid has the effect of advancing religion," the Court must determine whether the aid "result[s] in governmental indoctrination; define[s] its recipients by reference to religion; or create[s] an excessive entanglement." *Agostini*, 521 U.S. at 234.

Extensive governmental oversight in administering the funding may result in excessive entanglement. *Id.* at 232-33. "Interaction between church and state is inevitable, and we have always tolerated some level of involvement between the two." *Id.* at 233. Among the examples of arrangements approved by the Supreme Court: *Bowen v. Kendrick*, 487 U.S. 589, 615-17 (1988), held that the government may constitutionally review the materials and attend programs used by religious grantees of an adolescent counselling program. *See Agostini*, 521 U.S. at 233 (endorsing *Bowen*). *Roemer v. Board of Public Works of Maryland*, 426 U.S. 736, 764-65 (1976), held that the state may "conduct[] annual audits to ensure that categorical state grants to religious

colleges are not used to teach religion." *Agostini*, 521 U.S. at 233 (citing *Roemer*). Based on these and similar cases, the Supreme Court has held that "generally applicable administrative and recordkeeping regulations may be imposed on religious organization[s] without running afoul of the Establishment Clause." *Jimmy Swaggart Ministries v. Bd. of Equalization of Cal.*, 493 U.S. 378, 395 (1990).

As described above, the administrative fees provision permits an authorizer to "collect from the organizer of a charter school . . . an administrative fee equal to not more than three percent (3%) of the total amount the organizer receives during the state fiscal year for basic tuition support." Ind. Code § 20-24-7-4(d).[5]  Basic tuition support is, in turn, provided by the state on a per-pupil basis. Ind. Code §§ 20-43-1-8, 20-43-6-3.  In order to ensure that all collected fees comport with the statute, the authorizer must "summariz[e] the total amount of administrative fees collected by the authorizer and how the fees were expended." Ind. Code § 20-24-9-2(9).

The Coalition does not contend that the administrative fee provision "defines its recipients by reference to religion." *Agostini*, 521 U.S. at 234.  Rather, the Coalition's argument invokes the dangers of governmental indoctrination and excessive entanglement.  Three key features of the administrative fees provision ensure that the scheme comports with the Establishment Clause. First, the amount of the administrative fee is directly proportional to the number of students who elect to attend the charter school.  This means that the provision includes a substantial element of private choice, a factor emphasized by the *Zelman* Court in upholding a voucher program that allowed the states to reimburse private schools on a per-pupil basis. 536 U.S. at 648-63.  While the Charter School Act is distinct from *Zelman* in that the reimbursement is not routed through

---

[5] Notwithstanding this provision, the Coalition argues that Indiana directly pays the administrative fee to Grace College.  [Filing No. 61 at 12.]  As the Court's analysis shows, however, this is immaterial to the Establishment Clause analysis.

students as aid recipients, the Court finds it highly relevant that authorizers' reimbursement is tied to school parents' "genuine and independent private choice."  *Id.* at 652.

Second, nowhere does the Coalition argue or allege that the administrative fees charged are for reimbursement of anything other than legitimate, secular administrative services required as part of the authorizers' responsibilities under the Act.  This means that the funds may not result in governmental indoctrination.  Rather, the Coalition's lone argument is that the Act does not explain what an authorizer must do with the administrative fee after it is collected.  But to make this argument, the Coalition neglects the critical distinction between public fund reimbursement, which is constitutional when it neutrally applies and covers already-provided secular services, and public fund grants, which may be used for future services or projects.

The cases relied upon by the Coalition help demonstrate this distinction.  These cases involve prospective grants designed to further future activities and recognize that the Establishment Clause requires tight restrictions to ensure that future expenditures further only secular purposes.  *Bugher*, for example, involved an unrestricted cash grant to religious schools that was calculated by reference to the cost of using certain classroom technology.  249 F.3d at 609.  The statute included no limitation on how the money would be spent nor provided for any "attempt to monitor the use of the grant money received by the religious schools."  *Id.* at 613.  Similarly, *Committee for Public Education and Religious Liberty v. Nyquist*, 413 U.S. 756 (1973), invalidated a forward-looking grant "for the maintenance and repair of [sectarian school] facilities without any limitations on [the facilities'] use."  *Id.* at 777.  The Court held that "[i]f the State may not erect buildings in which religious activities are to take place, it may not maintain such buildings or renovate them when they fall into disrepair."  *Id.*

By contrast, reimbursement cases such as *Regan* expressly permit "payments to sectarian schools to cover the cost of specified activities." 444 U.S. at 658 (internal quotation omitted). In such cases, the public funding covers an amount already spent in furthering a secular purpose. *Regan* upheld a program that reimbursed religious schools for performing state-mandated testing. The Court specifically rejected the argument that this impermissibly advanced religion merely because the payments "relieved" the religious schools of having to pay for the state-required tests, even recognizing that the reimbursement may enable the religious schools to use their funds for religious purposes. *Id.* ("The Court has not accepted the recurrent argument that all aid is forbidden because aid to one aspect of an institution frees it to spend its other resources on religious ends.").

Here, the specified secular activity is the administration of authorizing charter schools, which the Coalition does not argue involves religious indoctrination. Under *Regan*, the fact that an authorizer such as Grace College might use the money, which otherwise would have been spent on authorization, on religious activities is irrelevant. Because the Act specifically limits authorizers to collecting secular administrative fees, the provision does not violate the Establishment Clause.

Finally, the Coalition does not meaningfully argue that the Act's process of reporting administrative fees results in unconstitutional governmental oversight, stating only that "[e]ven if extensive oversight of Grace College's use of funds reduced the likelihood the money would be used for religious purposes, it would simultaneously increase entanglement and still implicate the Establishment Clause." [Filing No. 61 at 15.] The annual reporting scheme here is far less invasive than the program approved in *Bowen*, which required the government not only to review the materials created by the funding recipients, but also to attend their programs. Rather, the reporting

process is a "generally applicable administrative and recordkeeping regulation[]," *Jimmy Swaggart*, 493 U.S. at 395, and therefore does not impermissibly entangle the state and religion.

Except insofar as the entire authorizing scheme may constitute an unconstitutional delegation, the Coalition has not plausibly alleged that the Charter School Act's administrative fee provision violates the Establishment Clause. The Court therefore **GRANTS** Seven Oaks' Motion to Dismiss Count II.

### C. Indiana Constitution (Count III)

Seven Oaks next argues that the administrative fee provision does not violate Article 1, section 6 of the Indiana Constitution, explaining that the Indiana Supreme Court has upheld school voucher programs that benefit religious schools. [Filing No. 58 at 19-21.] Seven Oaks also argues that the Indiana Supreme Court would not apply section 6 except where the funds directly aid "ecclesiastical functions." [Filing No. 58 at 21 (internal quotations omitted).]

In response, the Coalition argues that section 6 uses clear language that prohibits the Act's funding arrangement. [Filing No. 61 at 17-18.] The Coalition also argues that the Indiana Supreme Court would not read section 6 as narrowly as suggested by Seven Oaks. [Filing No. 61 at 18.]

Seven Oaks reiterates its arguments in reply. [Filing No. 62 at 14-15.]

Article 1, section 6 of the Indiana Constitution provides: "No money shall be drawn from the treasury, for the benefit of any religious or theological institution." Ind. Const. art. 1, § 6. As a federal court applying state law, the Court must turn to the decisions of the Indiana Supreme Court to determine how it would apply section 6 to this situation. *Allstate Ins. Co. v. Menards, Inc.*, 285 F.3d 630, 637 (7th Cir. 2002).

In *Meredith v. Pence*, 984 N.E.2d 1213 (Ind. 2013), the Indiana Supreme Court held that section 6 is implicated only when a government expenditure "directly benefits" a religious

institution. *Id.* at 1227 (emphasis omitted). The court upheld a school voucher program that provided funds for eligible school parents to enroll their children in religious schools. *Id.* at 1216. In rejecting the plaintiffs' constitutional argument, the court held that the "direct beneficiaries under the voucher program" were the participating students and that the religious schools' benefits were merely "ancillary." *Id.* at 1228-29. Additionally, the court noted that the only reason the religious schools received any funding at all was because voucher participants privately and independently elected to attend the religious schools. *Id.* at 1229.

*Meredith* also embraced the unanimous result reached by the court in *Embry v. O'Bannon*, 798 N.E.2d 157, 164 (Ind. 2003) (plurality decision), which upheld a "dual-enrollment" program allowing public schools to provide secular services for private schools in exchange for having private school students enroll in at least one public school class. *Embry*, 798 N.E.2d at 158; *Meredith*, 984 N.E.2d at 1228 (endorsing general logic in *Embry* while refining test). The *Embry* court recognized that the program provided "substantial educational benefits" for "all Indiana students," while at most the religious schools saved money by not having to "hire and pay as many teachers." 798 N.E. 2d at 167.

Against the backdrop of *Meredith* and *Embry*, the Court concludes that the Indiana Supreme Court would uphold the administrative fees provision of the Charter School Act as constitutional. In this case, the only benefit religious authorizers such as Grace College receive is incidental to the decision of school parents to enroll in charter schools, as in *Meredith*, because the amount of the administrative fee is tied to the schools' enrollment. Moreover, the administrative fees are merely a way for authorizers to recover some of the costs imposed upon them by the Charter School Act. In that regard, the fees are not really benefits at all, and to the extent they may be so characterized, they are wholly incidental to the benefits enjoyed by charter school students

24

as a result of the authorization system. The Coalition's Complaint fails to state a claim under the Indiana Constitution, and the Court therefore **GRANTS** Seven Oaks' Motion to Dismiss Count III.

### D. Relief Sought

Seven Oaks' final, one paragraph argument is that the Coalition failed to state a claim for declaratory judgment that Seven Oaks' charter is invalid and for an injunction prohibiting any state funds being distributed to Seven Oaks. [Filing No. 58 at 22-23.] Seven Oaks argues that the Coalition has failed to identify any "constitutional harm" from allowing Seven Oaks to operate under its charter and to receive funds. [Filing No. 58 at 22-23 (emphasis omitted).] Seven Oaks argues that, as a matter of contract law, Grace College's lack of authority to grant charters would not provide a basis to void Seven Oaks' charter. [Filing No. 58 at 22-23.]

In response, the Coalition argues that if Seven Oaks' charter were unconstitutionally authorized, then it constitutes an illegal contract void against public policy. [Filing No. 61 at 19.] The Coalition additionally argues that the demand for relief is not itself part of a claim and is thus not subject to dismissal under Rule 12(b)(6). [Filing No. 61 at 18-19.] The Coalition argues that the precise relief accorded must be left to the court's discretion. [Filing No. 61 at 18-19.]

The Coalition reiterates its arguments in reply. [Filing No. 62 at 15-16.]

The Court concludes that it cannot address the propriety of the relief sought by the Coalition at this stage. For example, Seven Oaks' charter, which the Coalition seeks to invalidate, is not even part of the record at this stage. Moreover, in *Lemon v. Kurtzman (Lemon II)*, 411 U.S. 192 (1973) (plurality opinion), the case relied upon by Seven Oaks, the plurality noted that the remedy crafted by the district court was accompanied by "well-supported" findings. *Id.* at 204. The Court has made no findings in this case, which is still before the Court on only the Coalition's

Complaint. Finally, the *Lemon II* plurality held that district courts have the power to fashion equitable remedies that incorporate "what is necessary, what is fair, and what is workable." *Id.* at 200. These issues must be determined on a record that would enable the Court to balance the myriad equities that would surely be at play should the Coalition prevail on its remaining Establishment Clause claim.

## IV.
### CONCLUSION

At the motion to dismiss stage, the plaintiff must only plausibly allege facts that, if true, invoke this Court's jurisdiction and state a claim to relief. The Coalition plausibly alleges that it has standing to pursue its claims and that the Charter School Act provision allowing religious institutions to act as authorizers violates the Establishment Clause. Accordingly, the Court **DENIES IN PART** Seven Oaks' Motion to Dismiss, [Filing No. 57], to the extent it seeks to dismiss the Coalition's Complaint for lack of jurisdiction and to the extent it seeks to dismiss Count I and certain portions of the Complaint's request for relief for failure to state a claim. The Complaint fails, however, to state a claim as to the administrative fees provision under either the Establishment Clause or the Indiana Constitution, and the Court therefore **GRANTS IN PART** Seven Oaks' Motion to the extent it seeks to dismiss Counts II and III.

The Court **VACATES** the previously-entered discovery stay, [Filing No. 60], and requests that the Magistrate Judge hold a conference with the parties to address the further development of this matter and to adjust remaining case management deadlines, as appropriate.

Date: 11/29/2017

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

26