UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| INDIANA COALITION FOR PUBLIC EDUCATION - MONROE COUNTY AND SOUTH CENTRAL INDIANA, INC., | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 1:17-cv-01295-JMS-MPB |
| JENNIFER MCCORMICK, | ) ) | |
| Defendant. | ) ) | |
| SEVEN OAKS CLASSICAL SCHOOL, INC., | ) ) ) | |
| Intervenor Defendant. | ) | |

## **ORDER**

Indiana's Charter School Act (or "Act"), Ind. Code § 20-24-1-1, *et seq.*, permits private and public universities (among other entities) to "authorize" public charter schools. Grace College, a religious institution, is among the private schools designated by the Act as an authorizer. The Indiana Coalition for Public Education ("Coalition") is an organization that advocates for traditional public schooling and opposes the diversion of funds to charter schools. The Coalition brought suit not against Grace College, but against Seven Oaks Classical School, Inc. ("Seven Oaks"), a school authorized by Grace College, and the Superintendent of Public Instruction, alleging that the Act violates the Establishment Clause of the U.S. Constitution by permitting Grace College to act as an authorizer. The parties have filed cross-motions for summary judgment. [Filing No. 79; Filing No. 81; Filing No. 82.]

The Court does not have the authority to reach the merits of the Coalition's claims. The Coalition ultimately fails to establish that its injuries are fairly traceable to the Act's authorizing

provision or that they are redressable by the relief available in this Court, and therefore fails to establish the "irreducible constitutional minimum of standing." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Therefore, for the reasons described below, the Court **DENIES** the Coalition's Motion, **GRANTS IN PART** Defendants' Motions, and **DISMISSES** the Coalition's claims **WIHTOUT PREJUDICE** for lack of subject-matter jurisdiction.

## I.
### LEGAL STANDARD

The parties move for summary judgment under Rule 56, which provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Defendants' standing arguments, which reach the Court's subject-matter jurisdiction, fall "under Rule 12(b)(1), not Rule 56." *Chicago Joe's Tea Room, LLC v. Vill. of Broadview*, 894 F.3d 807, 814 (7th Cir. 2018). However, because "a defendant challenging jurisdiction need not accept as true the allegations in the complaint and may ask the court to decide the jurisdictional issue by considering additional documents and affidavits," a jurisdictional challenge under Rule 12(b)(1) at the summary judgment stage "makes the motion look a lot like a summary judgment motion." *Id.* As the Supreme Court has explained, "[E]ach element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561. This means that, at the summary judgment stage, the plaintiff "can no longer rest on . . . 'mere allegations'" to establish standing, "but must 'set forth' by affidavit or other evidence 'specific facts' which . . . will be taken to be true." *Id.* (quoting Fed. R. Civ. P. 56(e)).

As *Lujan* explains, Defendants' jurisdictional challenge at this stage borrows the evidentiary requirements and procedures from summary judgment procedure under Rule 56. Thus,

Defendants assert that there is no genuine issue of material fact as to the Coalition's standing to bring this lawsuit, such that the Court should dismiss this matter for lack of subject-matter jurisdiction.  *Cf.* Fed. R. Civ. P. 56(a).  Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits.  *Cf.* Fed. R. Civ. P. 56(c)(1)(A).  A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact.  *Cf.* Fed. R. Civ. P. 56(c)(1)(B).  Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated.  *Cf.* Fed. R. Civ. P. 56(c)(4).  Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of the motion to dismiss.  *Cf.* Fed. R. Civ. P. 56(e).

The Court need only consider disputed facts that are material to the decision.  A disputed fact is material if it might affect the outcome of the suit under the governing law.  *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009).  In other words, while there may be facts that are in dispute, dismissal under Rule 12(b)(1) is appropriate if those facts are not outcome determinative.  *Cf. Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005).  Fact disputes that are irrelevant to the legal question will not suffice to defeat a motion to dismiss supported by admissible evidence.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In response to a Rule 12(b)(1) motion that is supported by evidence, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events.  *Lujan*, 504 U.S. at 561; *cf. Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003).  The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit

Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the . . . motion before them," *Johnson*, 325 F.3d at 898.

## II.
### BACKGROUND

As explained above, the Court must address its subject-matter jurisdiction before it may consider the merits of the Coalition's claims. The following background, based on the undisputed evidence, focuses on the facts relevant to the Coalition's standing, while providing additional information to assist in understanding the parties' dispute.

### A. The Parties

The Coalition is a nonprofit association located in Monroe County, Indiana, which advocates for the funding of its local public school corporations, the Monroe County and Richland-Bean Blossom Community School Corporations, and against the diversion of funds to private and charter schools. [Filing No. 79-4 at 1.] Among other activities, the Coalition contributed funds to a successful referendum to support the Monroe County School Corporation, opposed the chartering of Seven Oaks, and helped the town of Stinesville keep its elementary school open despite budgetary issues. [Filing No. 79-3 at 2-4; Filing No. 79-5 at 4-5; Filing No. 79-13 at 23.]

The Coalition's members include teachers, employees, board members, volunteers, and parents of schoolchildren at the two Monroe County public school corporations. [Filing No. 79-3 at 1; Filing No. 79-5 at 3.] These individuals report that their school corporations have suffered budget cuts, programming cuts, and a school closure, all of which negatively impact their abilities to educate students. [*See generally* Filing No. 79-3; Filing No. 79-5; Filing No. 79-13.] They attribute at least some of these budgetary constraints to the loss of students from the school

corporations to Seven Oaks;[1] as explained in greater detail below, Indiana provides school funding (as relevant here) on a per-student basis. *See* Ind. Code §§ 20-43-4-2, 20-43-6-3, 20-43-3-8. [*See generally* Filing No. 79-3; Filing No. 79-5; Filing No. 79-13] Where the students go, so too does the money.

The remaining Defendants include Intervenor-Defendant Seven Oaks, a secular public school chartered by Grace College, [Filing No. 81-1 at 25; Filing No. 81-3 at 2], and Superintendent of Public Instruction Jennifer McCormick. [*See* Filing No. 1 (Complaint); Filing No. 91 (dismissing Defendant James Betley).] The State Board of Education, for which Ms. McCormick serves as chairperson, consists of eleven members, Ind. Code § 20-19-2-2.2(a), and is responsible for establishing educational policy, Ind. Code § 20-19-2-14. Ms. McCormick also serves as director of the Department of Education, Ind. Code § 20-19-3-2—a separate entity from the Board—which is responsible for "distribut[ing] state tuition support distributions" to charter school organizers. Ind. Code § 20-24-7-2.

The remaining entity critical to this case is nonparty Grace College, an "evangelical Christian community of higher education which applies biblical values in strengthening character, sharpening competence, and preparing for service." [Filing No. 79-2 at 4.] Grace College requires its students to "accurately represent[] the Lord Jesus Christ . . . to the ends of the earth." [Filing No. 79-2 at 7.] Grace College is an authorizer of charter schools under Indiana law, Ind. Code 20-24-1-2.5, and has granted charters to a total of four schools, including Seven Oaks, [Filing No. 81-

---

[1] Defendants emphatically challenge the Coalition's evidentiary showing on this and many other points. As explained below, the Coalition stumbles at the causation and redressability stages of the standing analysis. The Court therefore declines to delve into the bulk of the parties' evidentiary disputes.

2 at 6].  The Coalition did not sue Grace College, and Grace College has not sought to intervene in this case.

### B.  Charter Authorization System[2]

With the stated goals of providing "innovative and autonomous programs" to serve "different learning styles" and offer "choices" and "flexibility," Ind. Code § 20-24-2-1, the Charter School Act created a group of "authorizers" to consider applications from prospective organizers wishing to operate "nonsectarian and nonreligious" public charter schools, Ind. Code § 20-24-1-4; *e.g.*, Ind. Code §§ 20-24-1-2.5, 20-24-1-3, 20-24-3-1.  The Act names as authorizers the mayor of Indianapolis, the Charter School Board,[3] and state and private nonprofit colleges, among others. Ind. Code § 20-24-1-2.5.  Prior to July 1, 2015, this meant that any college providing a "four (4) year educational program" could authorize a charter school, Ind. Code § 20-24-1-2.5(5) (2013) (amended 2015); a subsequent amendment requires colleges to seek approval from the state board prior to becoming authorizers, though the amendment grandparented any college (such as Grace College) that had issued a charter prior to July 1, 2015, Ind. Code §§ 20-24-1-2.5(5), 20-24-2.2-1.2.  Authorizers must "adopt standards of quality charter school authorizing, as defined by a nationally recognized organization with expertise in charter school authorizing."  Ind. Code § 20-24-2.2-1.5.  At least three such standards exist, [*see* Filing No. 79-17 at 6], and the Coalition has not identified any evidence suggesting that any of these standards (including the standards followed by Grace College, [*see* Filing No. 81-2 at 8-35]) permit religious considerations in the authorizing process.

---

[2] This discussion of the Charter School Act draws heavily on the Court's earlier ruling on Seven Oaks' Motion to Dismiss, available at 2017 WL 5889723, at *2-4.

[3] Despite its name, the Charter School Board appears for all intents and purposes to be just another state-sanctioned authorizer without any general responsibility or authority to monitor other authorizers' charter schools.  *See, e.g.*, Ind. Code § 20-24-2.1-1(a).

A prospective organizer initiates the application process by submitting a proposal to an authorizer. Ind. Code § 20-24-3-4(a). The proposal must provide a variety of information ranging from governance structure, Ind. Code § 20-24-3-4(b)(3)(C), to instructional methods, Ind. Code § 20-24-3-4(b)(3)(F), to admission criteria, Ind. Code § 20-24-3-4(b)(3)(H), to financial plans, Ind. Code § 20-24-3-4(b)(3)(M). The authorizer is then responsible for reviewing the application pursuant to its "procedures, practices, and criteria," which must be "consistent with nationally recognized principles and standards for quality charter authorizing." Ind. Code § 20-24-3-4.5. Prior to issuing a charter, the authorizer must conduct a public hearing in the school corporation where the proposed charter school would be located. Ind. Code § 20-24-3-5.5. Authorizers must annually report all charter proposals to the Indiana Department of Education, including the reasons for any rejections and the length of any approvals. Ind. Code § 20-24-3-10.

A charter may only be granted for a period of three to seven years, Ind. Code § 20-24-4-1(a)(5)(A), after which the organizer and authorizer may agree to a renewal, Ind. Code § 20-24-4-1(a)(6)(B). A charter school must "not remain in the lowest category or designation of school improvement . . . in the third year after initial placement in the lowest category or designation" as determined by the State Board of Education. Ind. Code § 20-24-2.2-2(a). An authorizer wishing to renew a charter school that does not comply with these minimum standards must petition and appear before the state board. Ind. Code § 20-24-2.2-2(b)–(c). The state board may take any appropriate action, including ordering the closure of the underperforming school. Ind. Code § 20-24-2.2-2(d).

The authorizer must conduct a performance review of a charter school at least once every five years, as specified in the charter. Ind. Code § 20-24-4-1(a)(6)(A). The charter must also specify its own standards for renewal, grounds for revocation of a charter prior to its expiration,

and accountability and assessment methodology, among other details.  Ind. Code § 20-24-4-1(a).  Additionally, the charter school and authorizer must set annual performance goals "designed to help each school meet applicable federal, state, and authorizer expectations."  Ind. Code § 20-24-4-1(b).

If an organizer's charter school proposal is rejected by an authorizer, the organizer may amend its proposal and submit the amended proposal to the same authorizer or may submit a proposal to another authorizer.  Ind. Code § 20-24-3-11.  There are no limitations on the number of times an organizer may submit a charter school proposal, *see id.*, nor is the decision to grant a charter reviewable by a state official outside of the improvement standards set forth above, [Filing No. 79-26 at 2-3].  Once authorized, a charter school receives state financial support in the same manner as all other Indiana public school corporations.  Ind. Code § 20-24-7-15.

Under Indiana law, the funding follows the student, meaning that a public school's state funding is based upon the number of attending students.  Ind. Code §§ 20-43-1-8, 20-43-6-3.  Charter schools, moreover, are not restricted by school corporation boundaries, but instead "must be open to any student who resides in Indiana."  Ind. Code § 20-24-5-1.  Indiana law also provides a mechanism for requesting transfers to school corporations outside of the boundaries of a student's local corporation.  Ind. Code § 20-26-11-5.  Finally, Indiana also has an uncapped voucher program for students meeting certain income- or non-income-based criteria who wish to take their per-student funding to an eligible private school.  Ind. Code §§ 20-51-4-1 to -12.  Many of the private schools participating in Indiana's voucher program are religious schools.  Indiana Department of Education, *2018-2019 Participating Choice Schools*, (Feb. 7, 2018), https://www.doe.in.gov/choice/2018-2019-participating-choice-schools (current list of schools participating in Indiana's voucher program).

### C. Seven Oaks' Approval

Seven Oaks is an Indiana charter school formed under the Charter School Act. [Filing No. 81-2 at 6.] Seven Oaks' approved application with Grace College was its third attempt at obtaining a charter. First, in 2014, Seven Oaks applied to the Indiana Charter School Board for authorization, which was opposed by the community and the local school corporations, and was ultimately denied. [Filing No. 79-30 at 3-5; Filing No. 79-32 at 3.] The Charter School Board assessed Seven Oaks' education plan its lowest rating. [Filing No. 79-30 at 3.]

In spring 2015, Seven Oaks again applied to the Charter School Board. The Charter School Board's preliminary staff evaluation noted improvement in Seven Oaks' business plan but concluded that the application still failed to meet state standards for educational plan and capacity to operate a school. [Filing No. 79-31 at 3-5.] After receiving the staff evaluation, Seven Oaks withdrew its application before the Board was scheduled to vote. [Filing No. 79-33 at 5-6.]

Finally, in fall 2015, Seven Oaks submitted its application (without significant substantive changes) to Grace College. [See Filing No. 79-33 at 7-9. Compare Filing No. 79-36 with Filing No. 79-35.] On January 13, 2016, after internal review, consideration of public comments following a public hearing, and external review by two independent experts, [Filing No. 81-2 at 4-6], Grace College's board of trustees approved Seven Oaks' application at a nonpublic meeting, [Filing No. 79-32 at 3]. Seven Oaks ultimately opened in fall 2016.

### D. Impact on School Corporations

Indiana law provides the bulk of a school's funding on a per-student basis. See Ind. Code §§ 20-43-4-2, 20-43-6-3, 20-43-3-8. This means that the public school corporations in Monroe County lost approximately $307,800 in funding for the 2016-17 school year after approximately 54 students left to enroll at Seven Oaks, and lost an additional $45,600 in funding for the 2017-18

school year after that number increased to 62.  [Filing No. 81-3 at 1-2].[4]  Should Seven Oaks continue to increase its enrollment as it plans to do, [Filing No. 70 at 4 (admitting allegation that it intends to increase enrollment to between "400-700 in future years," Filing No. 1 at 6)], the Coalition believes that the school corporations would continue to lose funding.  The school corporations must account for budgeting shortfalls by cutting teaching positions, supply budgets, extracurricular activities, and, in certain circumstances, entire schools.  [*See generally* Filing No. 79-3; Filing No. 79-5; Filing No. 79-13.]

Finally, relying on several experts to whom Defendants strenuously object, the Coalition maintains that the presence of Seven Oaks decreases the diversity of the public school corporations.  [*See* Filing No. 79-6 at 5; Filing No. 79-16 at 2; Filing No. 79-17 at 9-10.]  As explained below, the Court ultimately concludes that this dispute is immaterial, and assumes for the purposes of the parties' Motions that the presence of Seven Oaks in fact has the effect of decreasing diversity.

### E.  Procedural History

On April 25, 2017, the Coalition brought suit against Seven Oaks; Ms. McCormick, in her official capacity as Superintendent of Public Instruction and chair of the Board of Education; and James Betley, in his official capacity as executive director of the Charter School Board, alleging claims under the Indiana Constitution and the First Amendment of the U.S. Constitution.  [Filing

_____

[4] These numbers, provided by Seven Oaks, are substantially lower than those suggested by the Coalition, which believes that the Monroe County School Corporation lost $172,350 in funding for the 2016-17 school year after approximately 30 students (at $5,745 per student) left to enroll at Seven Oaks, [Filing No. 79-14 at 1], and the Richland-Bean Blossom School Corporation lost approximately $570,000 in funding after 100 students left to enroll at Seven Oaks, [Filing No. 79-27 at 2].  But in its reply brief, the Coalition explains that it is "willing for the purposes of summary judgment to accept the lower figures."  [Filing No. 87.]  Accepting the Coalition's concession, the Court utilizes the numbers provided by Seven Oaks, ultimately agreeing with the Coalition that it is an immaterial dispute of fact for the purposes of the parties' motions.

No. 1.]  On June 28, 2018, the Coalition voluntarily dismissed Seven Oaks.  [Filing No. 35.]  On August 2, 2018, the Court granted Seven Oaks' Motion to Intervene.  [Filing No. 56.]  On November 29, 2017, the Court granted Seven Oaks' Motion to Dismiss in part, dismissing the Coalition's claim under the Indiana Constitution and its First Amendment challenge to the authorizers' administrative fee collection.  [Filing No. 66.]  The Court held that the Coalition had plausibly alleged standing and a First Amendment claim regarding the provisions of the Charter School Act permitting religious institutions to serve as authorizers.  [Filing No. 66.]

On April 5, 2018, the Coalition moved for summary judgment, [Filing No. 79], and on May 22, 2018, Defendants filed cross-motions for summary judgment, [Filing 81; Filing No. 82].  On August 2, 2018, based upon the agreement of the parties in their summary judgment briefing that Mr. Betley could not redress the Coalition's alleged injuries, the Court dismissed the Coalition's claims against Mr. Betley.  [Filing No. 91.]  The parties' cross-motions for summary judgment on the Coalition's remaining First Amendment claims against Ms. McCormick and Seven Oaks are fully briefed and ripe for decision.

### III.
#### DISCUSSION

The Coalition, cognizant of its burden to establish standing at each stage of the proceedings, argues that it meets each of the three elements: injury, both as an organization and on behalf of its members; causation; and redressability.  First, as for organization injury, the Coalition argues that it spends money and resources advocating for funding of public school corporations which is undermined when students are able instead to take their state funding to Seven Oaks. [Filing No. 80 at 14-15.]  As for the injuries of its members, the Coalition alleges that its members (including parents, students, teachers, and other officials) are harmed by the loss of tuition support and by the loss of diversity caused by demographically-concentrated transfers.  [Filing No. 80 at

16.] Second, the Coalition argues that the causal chain for its injuries is unbroken from the Charter School Act's provision permitting Grace College to authorize charter schools. [Filing No. 80 at 17.] According to the Coalition, students have left the public school corporations solely because of Grace College's decision to charter Seven Oaks (which could not have happened without the Act), and which in turn has caused the public school corporations to lose the per-student funding which they would otherwise have received had the students not left. [Filing No. 80 at 17-18.] Finally, as for redressability, the Coalition argues that should the Court enjoin the funding to Seven Oaks, "many of its students would re-enroll in [the community school corporation] where they had previously attended." [Filing No. 80 at 18.]

Defendants, for their part, assert that the Coalition has failed to establish any of the three elements of standing. They argue that neither the Coalition as an organization nor its members have suffered a cognizable injury; that their injuries even if cognizable are not caused by the Charter School Act; and that the Coalition has not shown their injuries even if caused by the Act to be redressable, either in terms of the proper relief or as against the particular defendants. [Filing No. 83 at 10-19; Filing No. 84 at 12-25.] Key to the latter two arguments is the argument that the Coalition's injuries are caused not by the Act, but by an intervening cause—the independent decision of schoolparents to place their children in schools other than the community school corporations. [Filing No. 83 at 14-16; Filing No. 84 at 20-22.] Defendants further advance the related argument that redressability is uncertain because those same schoolparents may just as well choose to place their children in schools other than the school corporations' should Seven Oaks close. [Filing No. 83 at 16-19; Filing No. 84 at 22-23.] Even closure, according to Defendants, would not be proper as a redressability matter because the Coalition all but concedes that Seven Oaks has engaged in no Establishment Clause wrongdoing. [Filing No. 83 at 19; Filing No. 84 at

36-39.] Defendants argue that the wrongdoer, to the extent one exists, is Grace College, which is not and has never been party to this lawsuit. [Filing No. 83 at 19.] Altogether, Defendants argue that the Coalition's showing of standing is built on speculation and an injury (loss of funding and, potentially, diversity) unmoored from the alleged constitutional violations. [Filing No. 83 at 10-19; Filing No. 84 at 12-25.]

As alluded to above, the "irreducible constitutional minimum of standing" consists of three essential elements:

> First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal quotations and alterations omitted). Defendants challenge all three. But the failure to establish any one element means that a party lacks standing, and therefore that the Court lacks subject-matter jurisdiction. For the reasons described below, the Court concludes that causation and redressability present insurmountable hurdles for the Coalition, obviating the need to dredge through many of the parties' myriad evidentiary disputes regarding injury. The Court therefore assumes for present purposes that the Coalition's claimed associational injuries of reduced funding and diversity suffice to establish a concrete, particularized, and actual injury and focuses below on the Coalition's showing of causation and redressability. *Cf. In re LimitNone, LLC*, 551 F.3d 572, 576 (7th Cir. 2008) (". . . [T]he Supreme Court has consistently held that there is no mandatory sequencing of jurisdictional issues." (internal quotations omitted)).

### A. The Overlap Between Causation and Redressibility

"As is often the case, the questions of causation and redressability overlap." *Massachusetts v. EPA*, 549 U.S. 497, 543 (2007). In fact, these two elements "were initially articulated by the Court as two facets of a single causation requirement." *Allen v. Wright*, 468 U.S. 737, 753 n.19 (1984) (internal quotation omitted), *abrogated in part on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014). "[T]he former examines the causal connection between the assertedly unlawful conduct and the alleged injury, whereas the latter examines the causal connection between the alleged injury and the judicial relief." *Id.*

Causation and redressability, while closely related, are in the final analysis distinct concepts. The Supreme Court has "reject[ed] any categorical requirement that there be a logical nexus between the plaintiff's injury and the nature of the constitutional rights [the plaintiff] asserts," *Gillespie v. City of Indianapolis*, 185 F.3d 693, 701-02 (7th Cir. 1999) (citing *Duke Power Co. v. Carolina Envtl. Study Group, Inc.*, 438 U.S. 59 (1978)), and there is "no requirement that an Establishment Clause injury must implicate a plaintiff's religious sensibilities in order for a plaintiff to establish standing to assert such a claim," *Montesa v. Schwartz*, 836 F.3d 176, 196 n.11 (2d Cir. 2016).

That said, the absence of a connection between religion and the alleged injury remains relevant to the standing analysis, and cases where "the relief requested goes well beyond the violation of law alleged" demonstrate the need to "keep the inquiries separate" to ensure that the injury is actually caused to the allegedly unlawful conduct. *Allen*, 468 U.S. at 753 n.19. The mere availability of a remedy that may have some "substantial effect" on the injury does not, by itself, indicate that the challenged conduct caused the injury. *See id.* In situations where the alleged injury is unmoored from the constitutional violation at issue, it is far more likely that the

"plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else*." *Lujan*, 504 U.S. at 562 (emphasis in original). Unlike in lawsuits where "the plaintiff is himself [or herself] an object of the action (or foregone action)," in which "there is ordinarily little question that the action or inaction has caused [the plaintiff] injury," "much more is needed" in cases challenging the government's regulation of third persons. *Id.* at 561-62. The Supreme Court in *Lujan* discussed at length the requirements for establishing standing under such circumstances:

> In that circumstance, causation and redressability ordinarily hinge on the response of the regulated (or regulable) third party to the government action or inaction— and perhaps on the response of others as well. The existence of one or more of the essential elements of standing depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict, and it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury. Thus, when the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily substantially more difficult to establish.

*Id.*

This case fits the situation described in *Lujan*, where the plaintiff claims an injury due to the state's regulation of third parties not before the Court. Here, the Coalition complains that Grace College—a nonparty—is performing the governmental task of authorizing charter schools, in violation of the Establishment Clause, because it has been enabled to do so by the Charter School Act. The Coalition and its members have neither been compelled to do, nor prevented from doing, anything at all. And the disconnect between the Coalition's requested relief (an injunction against distributing funds to Seven Oaks) and the alleged Establishment Clause violation (the authorizing) further raises red flags that its injuries may not in fact be traceable to the Charter School Act's authorization scheme. *Cf. Allen*, 468 U.S. at 753 n.19 ("Even if the relief respondents request

might have a substantial effect on the desegregation of public schools, whatever deficiencies exist in the opportunities for desegregated education for respondents' children might not be traceable to IRS violations of law—grants of tax exemptions to racially discriminatory schools in respondents' communities.").  In short, the Coalition must make the "substantially more difficult" case for causation and redressability as set forth in *Lujan*.

### B.  Article III Causation

Causation in the standing context does not mean "[p]roximate causation."  *Lexmark Int'l, Inc.*, 572 U.S. at 134 n.6.  Article III, from which the standing requirement is derived, "requires only that the plaintiff's injury be fairly traceable to the defendant's conduct."  *Id.*  The alleged constitutional violation need not be "the very last step in the chain of causation.  While . . . it does not suffice if the injury complained of is 'the result of the *independent action* of some third party not before the court,' that does not exclude injury produced by determinative or coercive effect upon the action of someone else."  *Bennett v. Spear*, 520 U.S. 154, 159 (1997) (quoting *Lujan*, 504 U.S. at 560-61) (emphasis in original and alterations omitted).

Several cases help illustrate the line between "independent action," which breaks the Article III chain of causation, and actions which, though taken by third parties, are nonetheless traceable to the "determinative or coercive" impact of the challenged action.  *Bennett*, heavily relied upon by the Coalition, demonstrates a situation in which the causal chain remained intact despite the actions of nonparties.  There, the plaintiffs (who depended upon irrigation for various things) brought suit under the citizen-suit provision of the Endangered Species Act, challenging a "Biological Opinion" issued by the Fish and Wildlife Service which concluded that a continued irrigation project should be shut down because of the potential of impacting endangered species of fish.  520 U.S. at 157-61.  The plaintiffs did not, however, sue the Bureau of Reclamation, which

is the agency ultimately responsible for the status of the project. The Court held, however, that the plaintiffs could maintain their claims because the Service's opinion "has a powerful coercive effect on the action agency [the Bureau.]" *Id.* at 169. Moreover, "the action agency must not only articulate its reasons for disagreement (with the Service's opinions), but . . . it runs a substantial risk if its (inexpert) reasons turn out to be wrong. A Biological Opinion of the sort rendered here alters the legal regime to which the action agency is subject." *Id.* Inasmuch as the Fish and Wildlife Service's Biological Opinion had a legal effect on the outcome of the irrigation project, the plaintiffs had made a sufficient showing of causation to survive a motion to dismiss.

Cases since *Bennett* make clear, however, that it is not enough that the challenged action be a but-for cause of the alleged injury. The D.C. Circuit's opinion in *Fulani v. Brady* provides such an example. 935 F.2d 1324 (D.C. Cir. 1991). The plaintiff, Dr. Fulani, was a third-party presidential candidate who was excluded by the Commission for Presidential Debates ("CPD") from participating against the major-party candidates. *Id.* at 1326. She brought suit against the IRS, challenging the CPD's tax-exempt status. *Id.* The D.C. Circuit first discussed and synthesized the Supreme Court's standing cases involving challenges to the actions of nonparties and identified two, equally-determinative intervening causes that cut off the Article III causal chain from the tax exemption to CPD's exclusion of third-party candidates.

First, the court addressed the reasoning of the Second Circuit in a parallel case, which held that because a Federal Election Commission ("FEC") regulation only allows nonprofit corporations to sponsor electoral debates, the tax-exempt status was a sufficient "cause" of the injury for standing purposes. *Id.* at 1329 (citing *Fulani v. League of Women Voters Educ. Fund*, 882 F.2d 621 (2d Cir. 1989)). The D.C. Circuit disagreed, holding that the FEC regulation instead demonstrated that Dr. Fulani's injury could not be fairly traced to the tax-exempt status:

It is true that CPD's tax-exempt status is a cause-in-fact of appellant's injury; were it not for that status, the CPD would be unable to sponsor the debates under existing FEC regulations. However, the FEC's regulation is an intervening cause—were it not for the regulation, the CPD's tax status would be relevant to its sponsorship of the debates only insofar as it facilitated the CPD's funding through tax-exempt funds. Thus, Fulani's claim would be addressed more appropriately under the FEC's regulation than through the Internal Revenue Code.

*Id.* Second, the court held that indeterminate future actions of the CPD itself "remain[] an intervening causal agent":

Were we to order revocation of the CPD's tax-exempt status, the CPD might decline to sponsor presidential debates altogether. This would remove the allegedly unfair advantage to Fulani's competitors, but would prevent Fulani from receiving the same benefit. Or the CPD could choose to include Fulani within the debates in order to retain its tax-exempt status, in which case the two major-party candidates might decline to participate in debates that do not present them as the two salient candidates, thus depriving the debates of the media appeal that Fulani seeks. Thus, while the IRS's decision to provide the CPD with tax-exempt status is a cause of Fulani's claimed injury, it is merely one in a chain of independent causal factors necessary to achieve this injury. Moreover, given the number of causal factors significant to Fulani's alleged injury, we find that the claim lacks sufficient redressability to warrant standing under the Supreme Court's test in *Allen v. Wright, supra.*

*Id.* (citations omitted).

This case falls squarely on the *Fulani* side of the divide, confirming that the Coalition's injury is not fairly traceable to the Charter School Act's authorizing provisions. The Coalition maintains that "[t]he chain of [causation] in this case is simple," setting forth the following sequence:

1. IC § 20-24-1-2.5(5) empowers Grace College to authorize charter schools.
2. Grace College authorized the Seven Oaks charter.
3. Some pupils are enrolling in Seven Oaks who would otherwise have enrolled in MCCSC or RBBCSC.
4. The funding for MCCSC and RBBCSC is reduced for every pupil who transfers to Seven Oaks, because IC § 20-43-6-3 requires defendant McCormick to distribute state funds based on enrollment.
5. The injuries complained of by staff and parents occur because the schools have less money.

But for the statute empowering Grace College to authorize the charter for Seven Oaks, none of this would have occurred.

[Filing No. 80 at 17 (internal citations omitted).]

The Coalition argues the Act is a but-for cause of its loss of students, and therefore of its funding and diversity. But *Fulani* and the Supreme Court cases it interprets explain that but-for causation does not equate to Article III causation. If anything, the Coalition's causal chain is even more attenuated than that held insufficient in *Fulani*. For one, there are several significant intervening causes. First, there is Grace College. Grace College is the actor whose authorization of Seven Oaks allegedly violates the Establishment Clause. The Coalition's complaint is not merely that the Act allocates funds a certain way, but that Grace College in particular has granted the charter which has caused funds and students to be diverted to Seven Oaks which the Coalition believes should instead be allocated to the public school corporations. Grace College is a critical, "independent actor[] not before the court," and it is Grace College's decision to authorize Seven Oaks about which the Coalition complains. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013) (quoting *Lujan*, 504 U.S. at 562). Much as the tax-exempt status of the CPD would do no harm in the absence of the FEC regulation, the Charter School Act itself would do no harm to the Coalition's members were it not for the authorizing activity of Grace College.

The more critical intervening causes are the individual decisions of the parents of the schoolchildren who left the school corporations to attend Seven Oaks. The complained-of diversion of funding and diversity is tied directly to the loss of students. And unlike in *Bennett*, the Charter School Act has no coercive or determinate effect on these independent decisions. Not a single parent was compelled, either as a practical matter or officially, to leave the school corporations. Rather, Indiana law gave the parents nearly "unfettered choices" in selecting where to bring their per-student educational funding. *Id.* (quoting *Lujan*, 504 U.S. at 562). Among these:

remain at a school corporation, transfer to another school corporation, transfer to another charter school, and, if certain conditions are met, use Indiana's voucher program to transfer to a private school—which may be religious. With or without the Act's provision allowing Grace College to authorize charter schools, parents remain just as free to take their per-student funding away from the public school corporations to any number of other schools. *Cf. Lujan*, 504 U.S. at 562 (noting standing problems where causation "hinge[s] on the response of the regulated . . . third party to the government action or inaction"). Therefore, the Coalition's showing of causation falls short.

### C. Redressability

The role of the nonparty parents of the schoolchildren also presents insurmountable problems of redressability for the Coalition, demonstrating the overlap between the redressability and causation elements of the standing analysis. At the summary judgment stage of a jurisdictional challenge, the proponent of jurisdiction must demonstrate that it is "'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Id.* at 561 (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 38, 43, 96 (1976)). Evidence of past conduct is insufficient, on its own, to demonstrate the future discretionary conduct of independent actors not before the court. *See Cabral v. City of Evansville*, 759 F.3d 639, 642 (7th Cir. 2014) ("If we vacated the injunction, Evansville might grant West Side's permit, as it did in 2013. On the other hand, Evansville might also deny the permit for any number of reasons. Both courses of action would be consistent with any vacating order, and we have no way of knowing which way Evansville would proceed. . . . West Side might argue that Evansville's grant of the permit in 2013 allows us to infer that Evansville would permit the erection now, but West Side has not presented any proof along those lines.").

Here, the Coalition has failed to demonstrate that its injuries, which may all be traced to the loss of students to other schools, would be redressed by providing the remedy it seeks—declaring the authorizing provisions of the Charter School Act unconstitutional and enjoining Ms. McCormick from distributing state funds to Seven Oaks. This remedy could conceivably redress the Coalition's injuries only if it could show that Seven Oaks' students would return to the public school corporations should Seven Oaks be closed.

This is far from a foregone conclusion because Indiana law allows students to take their per-student tuition support to any number of non-corporation schooling options, up to and including religious private schools, should certain conditions be met. The Coalition does not, however, point to any evidence suggesting that the public school corporation's current students wish to leave. And though they assert that the students who have left would return to the school corporations were Seven Oaks to close, they offer no evidence (for example, in the form of affidavits from parents of Seven Oaks students) that this is in fact the case. The *only* evidence to even suggest that students might return to the school corporations comes from an expert report opining that Seven Oaks students are unlikely to be home schooled or attend private schools. [Filing No. 79-16 at 5-6.] But the factual issue of whether students would return to the school corporations if Seven Oaks were closed is not a subject on which expert testimony would be helpful to a factfinder. *Cf. United States v. Christian*, 673 F.3d 702, 710-11 (7th Cir. 2012). Even if it were the case that Seven Oaks students would generally not prefer homeschooling or private schools as the expert suggests, that still leaves unanswered the issue of whether they would elect to return to public school corporations over the other options. In the end, the Coalition asks the Court to speculate that this would be the case, with nothing to support this speculation except the fact that certain students left the school corporations to attend Seven Oaks. As *Cabral* explains,

21

past conduct alone fails to demonstrate the likely future conduct of the independent parents, all of whom have multiple options for future schooling. The Coalition's "speculation is not enough to turn this into a case and controversy with a redressable injury." *Cabral*, 759 F.3d at 642.

Moreover, the Coalition's redressability argument gratuitously assumes that immediate cessation of its funding would be an appropriate or viable remedy. But *Lemon II*, the Supreme Court's remedy opinion following its seminal decision setting forth the test for identifying Establishment Clause violations, emphasizes that, "in constitutional adjudication as elsewhere, equitable remedies are a special blend of what is necessary, what is fair, and what is workable." *Lemon v. Kurtzman (Lemon II)*, 411 U.S. 192, 199 (1973) (plurality decision). Sculpting an appropriate remedy requires the Court to take into account "reliance interests" which "weigh heavily," particularly when the remedy sought is overbroad as against the constitutional harm. *Id.* at 203. Though questions of remedy may also touch the merits of a plaintiff's claim, *cf. Lewis v. Casey*, 518 U.S. 343, 630 n.7 (1996), "standing to demand remediation" is "limited to the inadequacy that produced the injury in fact that the plaintiff has established," *id.* at 357. Phrased more simply, "A plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018); *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 353 (2006) ("The remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established." (internal quotation and alteration omitted)).

The Coalition's request that the Court declare the Act's authorizer scheme unconstitutional and prohibit future funding highlights the clear disconnect between the Coalition's Establishment Clause theory (unconstitutional delegation of state authority) and alleged injury (loss of students and funding). There is no likelihood that this Court could grant the Coalition's request without running afoul of the principles enunciated above—particularly in light of the fact that the Coalition

has failed to produce any evidence suggesting that Seven Oaks has provided anything other than constitutionally proper secular education, or that Grace College has allowed its religious beliefs to impact its authorization procedures. At bottom, the Coalition does not have standing to seek such overbroad relief because its injury cannot be traced to the mere fact of Seven Oaks' continued funding. Rather, the appropriate remedy under *Lemon II* were the Coalition to succeed on the merits of its claim would be to maintain the status quo for a reasonable time while Seven Oaks located another authorizer. This would also be consistent with Indiana law, which allows for the "state board . . . to take all steps necessary" to "decommission" an authorizer relinquishing its authorizer status, "including overseeing the orderly winding up of authorization activities." Ind. Code § 20-24-2.2-7.

Even though this solution would remedy the underlying alleged Establishment Clause infirmity, it would provide the Coalition with absolutely no relief, because the alleged diversion of students and funding would persist. And Indiana's private school voucher program, which the Coalition has not challenged, would also persist, where funds go directly to religious schools instead of public school corporations. Indeed, it is difficult if not impossible to distinguish Indiana's voucher program, which is constitutional under the principles announced in *Zelman v. Simmons-Harris*, 536 U.S. 639 (2002), from the system challenged by the Coalition in this case.[5] Both permit parents to divert resources from public school corporations to schools with some connection to religious organizations, be it an overtly religious private school, or a secular charter

---

[5] The Court remains cognizant of its obligation to ensure that it has subject-matter jurisdiction before it may address the merits of a plaintiff's case. But the Court observes that the complete paucity of evidence suggesting that religion plays any role in either the authorizing process or Seven Oaks' education would present insurmountable hurdles for the Coalition were it permitted to litigate the merits of its claims. Rather, as with a voucher program, the Act permits all eligible institutions, public and private, to participate in the authorization scheme, and apportions funding to the charter schools on a choice-driven, per-student basis.

school authorized in a secular fashion by a religious institution. If anything, Grace College may have a complaint under the Free Exercise Clause were private secular colleges able to authorize charter schools but religious colleges excluded solely because of their religious character. *Cf. Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012 (2017) (noting stringent scrutiny applied to programs which exclude only religious organizations). The Coalition's Complaint is really a challenge to Indiana's policies of school choice and of school funding following the student, draped in the clothing of an Establishment Clause challenge. But the Coalition challenges just one recipient of that funding, and it all but admits that its alleged injuries are in no meaningful way caused by the religious character of Seven Oaks' authorizer. Rather, it is a mere coincidence that Seven Oaks, with which the public school corporations must compete for students, happens to be authorized by a religious institution. The school corporations would face exactly the same funding difficulties (and thus the Coalition would face the same alleged injury) had Seven Oaks been authorized by a secular private college, as permitted by the Charter School Act, instead of Grace College. These observations confirm the gross misfit between the alleged constitutional injury and the Coalition's requested relief.

Finally, the Coalition has not shown that the Court may order the requested relief from Seven Oaks. To reiterate, the Coalition wants the Court to declare the Act's authorizing provision unconstitutional and enjoin the state from providing further funding. In order to receive this relief, the Coalition must show that its injuries are "'fairly traceable' to a defendant's actions." *Doe v. Holcomb*, 883 F.3d 971, 978 (2018) (quoting *Lujan*, 504 U.S. at 560). But Seven Oaks is not responsible for distributing state funding, nor is it responsible for the allegedly unconstitutional authorizing that allows them to receive state funding. The Coalition fails to demonstrate that the

Court could order Seven Oaks to provide the relief it seeks, and therefore lacks standing to pursue its claim against Seven Oaks for this additional reason.

## IV.
### CONCLUSION

The Coalition has set forth several policy concerns with respect to the operation of the Charter School Act and its impact on public school corporations. But it has not met its burden of demonstrating that its alleged injuries are fairly traceable to the Charter School Act's authorizing provision or that its injuries are likely redressable by the relief available in this Court. The Court therefore lacks subject-matter jurisdiction over the Coalition's claims, and **DENIES** the Coalition's Motion for Summary Judgment [79], **GRANTS IN PART** Defendants' Motions for Summary Judgment [81; 82] insofar as they challenge the Court's subject-matter jurisdiction, and **DISMISSES** the Coalition's Complaint **WITHOUT PREJUDICE**. Final judgment will issue accordingly.

Date: 9/6/2018

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana